UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BARBARA JEAN CARTER,

      Plaintiff,                        Case No. 2:20-cv-10863

                                          District Judge Terrence G. Berg

v.                                  Magistrate Judge Kimberly G. Altman

ANDREW SAUL, COMMISSIONER
OF SOCIAL SECURITY,

      Defendant.

_____/

**REPORT AND RECOMMENDTION ON CROSS MOTIONS FOR
SUMMARY JUDGMENT**

I.      Introduction

This is a social security case.  Plaintiff Barbara Jean Carter brings this action

under 42 U.S.C. § 405(g), challenging the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Both parties have filed summary judgment motions (ECF Nos. 17, 18), which have

been referred to the undersigned for a Report and Recommendation under 28

U.S.C. § 636(b)(1)(B).

For the reasons set forth below, substantial evidence supports the

Administrative Law Judge's ("ALJ") conclusion that Carter is not disabled under

1

the Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 18) be GRANTED, Carter's Motion for Summary Judgment (ECF No. 17) be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.    Background

### A.    Procedural History

Carter was 48 years old at the time of her alleged onset date of June 15, 2016.  (ECF No. 14, PageID.196).  She completed high school and had prior work experience as a care giver and food service cashier.  (*Id*., PageID.212).  She alleged disability due to lupus, rheumatoid arthritis, Hashimoto's thyroiditis, antiphospholipid syndrome, autoimmune liver disease, fibromyalgia, gastroparesis, high blood pressure, right hand web space contracture deformity, and depression. (*Id*., PageID.211).

After Carter's DIB application was denied at the initial level on April 18, 2017 (*Id*., PageID.130-133), she timely requested an administrative hearing, which was held on October 24, 2018, before the ALJ.  (*Id*., PageID.78-113).  Carter testified at the hearing, as did a vocational expert ("VE").  (*Id*.).  On February 26, 2019, the ALJ issued a written decision finding that Carter was not disabled during the relevant time period.  (*Id*., PageID.60-73).  On February 4, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the

2

Commissioner.  (*Id.*, PageID.49-51).  Carter timely filed for judicial review of the final decision.  (ECF No. 1).

### B.     Medical Evidence

The medical record reflects that Carter underwent x-ray imaging of the pelvis on June 16, 2016 that showed mild joint space narrowing in the hips bilaterally with degenerative arthritis.  (ECF No. 14, PageID.373).  Imaging of the spine that day showed symmetrical sacroiliac joints without evidence of sacroiliitis.  (*Id.*, PageID.372).  Imaging of the ankle was also conducted, showing a heel spur.  (*Id.*, PageID.371).  On July 19, 2016, another x-ray of the lumbar spine showed that despite a reported history of low back pain radiating down the right leg, Carter had no evidence of acute osseous or articular pathology – in other words, normal results.  (*Id.*, PageID.370).  This changed slightly on August 8, 2016, when an x-ray conducted to examine Carter's limb length variation showed minimal degenerative changes in the lower lumbar spine as well as symmetrical joint space narrowing in the bilateral hips.  (*Id.*, PageID.369).  Additionally, that scan resulted in an impression of parallel leg length discrepancy, showing that Carter's left leg and sacral base were longer than her right.  (*Id.*).

Prior to the August 2016 x-ray, on July 28, 2016 Carter reported to her physician, Scott McDougall, D.O., that she began experiencing the current bout of right side sciatica back pain after getting into and out of her husband's truck in

3

June 2016, and was currently experiencing a pain level of 8 out of 10.  (*Id.*, PageID.336).  She claimed an increase in symptoms after 10-15 minutes of sitting, and five minutes of standing or walking, as well as increases in pain associated with bending, lifting, reaching, and stooping.  (*Id.*).  Objectively, Carter was found to have signs and symptoms consistent with right sciatica with back pain, sacroiliitis, muscle weakness, and abnormality of gait.  (*Id.*, PageID.339).  Carter's "problem list" included decreased strength, stability, range of motion, function, and proprioception; impaired gait, and decreased postural stability; and skilled physical therapy was recommended as medically necessary to improve her function.  (*Id.*).  Notes also indicated that "rehab potential is good for stated goals." (*Id.*).

Carter went to physical therapy on August 2, 2016, reporting that she felt better after doing her exercises and was able to go shopping.  (ECF No. 14, PageID.343).  She had some pain in the buttocks and back of the thigh, but was able to sleep in bed for the first time in a very long time.  (*Id.*).  Post-treatment, Carter had zero pain out of ten and no numbness.  (*Id.*, PageID.344).  On August 8, 2016, she returned to physical therapy and rated her pain at a seven out of ten.  (*Id.*, PageID.345).  She had been sick and was not taking her medications.  (*Id.*).  Her pain post-treatment was reduced to a four out of ten.  (*Id.*).  On August 10, 2016, Carter reported that she had felt good until doing a lot of walking the day prior,

with less pain in the buttocks and none in her legs. (*Id*., PageID.346). Her pain post-treatment was at a two out of ten while sitting. (*Id*., PageID.347).

At Carter's next two visits to physical therapy, she reported much higher pain levels of eight-to-nine and nine out of ten, respectively. (*Id*., PageID.348-349). Then, at her last scheduled appointment on August 23, 2016, Carter declined a formal assessment due to her lack of progress and requested to be discharged from physical therapy. (*Id*., PageID.351-352). She stated that she was under a lot of stress since resigning from her job and was debating applying for disability. (*Id*.). She became emotional during the session and reported having thoughts of suicide as well. (*Id*.).

On September 12, 2016, Carter had an MRI of her lumbar spine that showed a worsening condition: moderate L5-S1 disc desiccation, a large right paracentral L5-S1 herniated nucleus pulposus with moderate spinal stenosis, and severe impingement on the right S1 nerve root. (*Id*., PageID.365). An EMG on the same day showed active right S1 radiculopathy related denervation changes as well. (*Id*., PageID.366). Then, on November 23, 2016, Carter underwent a microdiscectomy at L5-S1 on the right site. (*Id*., PageID.404). A month later, Carter was seen on December 30, 2016, stating that she experienced some occasional lower back discomfort and shooting pains into her right leg, as well as some numbness in her right foot, but that she felt overall the pain had diminished.

5

(*Id*, PageID.420).  The physician's assistant noted that Carter was progressing as expected and that the nerve can take many months or even up to a year to heal. (*Id*., PageID.421).  Carter was instructed to be mindful of her bending and twisting and not to lift anything above five to ten pounds from waist height, and to follow these restrictions for an additional six weeks.  (*Id*.).  She was further instructed that once three months had passed from the operation, she could resume normal activities "within reason, always being mindful of proper back biomechanics." (*Id*.).

Carter notes that at a mental status examination on April 3, 2017, she was observed to have a stiff and edgy posture and a delayed gait.  (ECF No. 14, PageID.426).  On August 1, 2017, Carter presented to a rheumatologist complaining of generalized body aches and pains, especially present in her hands, lower back and knees, as well as fatigue.  (*Id*., PageID.511).  On exam, Carter had no musculoskeletal edema or tenderness, normal reflexes, and no evidence of inflammatory arthropathy.  (*Id*., PageID.513).  Her physical exam was entirely normal.  (*Id*.).  The rheumatologist discussed Carter benefiting from a sleep study to rule out sleep apnea, complications associated with obesity, exercise, and eating habits.  (*Id*.).  She was seen again on August 29, 2017, and again had normal results upon physical examination.  (*Id*., PageID.516).  Dietary modification, regular exercise, and aggressive weight reduction were discussed.  (*Id*.).

6

On January 16, 2018, Carter returned to physical therapy; she reported that she had fallen three times in late 2017, causing her pain levels to increase from a four out of ten to a six on the same scale. (*Id*., PageID.519). X-rays following her falls were negative, but the falls intensified her pain, which was not relieved by Tylenol or Motrin. (*Id*.). Her current functional limitations were listed as having to get up after ten minutes of sitting, having to change position after ten minutes of standing, an increase in pain when walking, difficulty bending forward, and inability to get comfortable while trying to sleep. (*Id*.). These appear to be subjective reports. On examination, Carter had limited range of motion in lumbar flexion, extension, and rotation, as well as increased pain from these motions. (*Id*., PageID.521). Strength in her transverse abdominis was limited, as was the range of motion in her hips. (*Id*.). There was once again a finding that rehabilitation potential was good through physical therapy. (*Id*., PageID.522). She returned to physical therapy twice more, reporting similar pain levels and a lack of progress toward her goals. (*Id*., PageID.526-527). On February 5, 2018, Carter called to cancel her appointment and discontinue therapy, stating that it was not working. (*Id*., PageID.524).

On February 8, 2018, Carter underwent another MRI of the lumbar spine. (*Id*., PageID.592). It showed mild disc desiccation at two levels and mild discogenic narrowing at L5-S1. (*Id*.). It also showed interval resection of the right

7

paracentral L5-S1 herniated nucleus pulposus, but no spinal stenosis or neural

foramina narrowing.  (*Id*.).  Carter then attended a pain clinic on February 20,

2018, where physical examination revealed decreased lordosis;[1] worsening pain

with extension, rotation, and side-bending; positive bilateral facet signs at three

spinal levels; bilaterally provocative sacroiliac joints; tenderness to palpation; and

positive Gaenslen's test[2] and Patrick's test,[3] bilaterally.  (*Id*., PageID.561).  She

was provided with a trochanteric bursa injection bilaterally to reduce pain, and left

the office with pain level at four out of ten and able to ambulate without difficulty.

(*Id*., PageID.562-564).  Then on February 27, 2018, Carter returned to physical

therapy, reporting that she had piriformis[4] muscle spasms and arthritis in the hips

and back.  (*Id*., PageID.528).  She also stated that her injection did not relieve

much of the pain so far.  (*Id*.).  At this session Carter had less limitations in range

of motion, though some were still present, and there was still an associated

increase in pain.  (*Id*., PageID.530-531).

---

[1] "Lordosis is the inward curve of the lumbar spine (just above the buttocks)."
https://medlineplus.gov/ency/article/003278.htm (last accessed March 15, 2021).
[2] Gaenslen's test "can be used to detect musculoskeletal abnormalities and
primary-chronic inflammation of the lumbar vertebrae and Sacroiliac joint."
https://physio-pedia.com/Gaenslen_Test (last accessed March 15, 2021).
[3] Patrick's test, also known as the FABER test, is "a clinical pain provocation test
to assist in diagnosis of pathologies at the hip, lumbar and sacroiliac region."
https://physio-pedia.com/FABER_Test (last accessed March 15, 2021).
[4] The piriformis is "is a flat muscle and the most superficial muscle of the deep
gluteal muscles."  https://physio-pedia.com/Piriformis (last accessed March 15,
2021).

Carter next had physical therapy on March 13, 2018, stating that she was not doing well prior to treatment, with pain at a six out of ten. (*Id*., PageID.533). She had palpable tenderness and spasm to the right piriformis and "glute med areas" prior to treatment, but stated that after treatment she feels better and has less pain. (*Id*.). Treatment decreased her spasms and increased her range of motion. (*Id*., PageID.534). Her next session that month was similar, as she came in with pain at a six out of ten after having fallen in her kitchen, with pain decreased to a four out of ten and increased mobility and flexibility after treatment. (*Id*., PageID.535). Carter also had improved gait patterns and increased speed with ambulation at this visit. (*Id*.). Carter attended physical therapy again on March 21, 2018, with similar reported pain levels and little progress throughout. (*Id*., PageID.536-538). It was noted that her progress was limited because she had missed sessions due to illness. (*Id*., PageID.538).

On March 28, 2018, Carter received another sacroiliac joint injection bilaterally, which decreased her pain from a seven to a five out of ten. (*Id*., PageID.565-567). The record shows additional injections in May, June, and July 2018. (*Id*., PageID.568-576). Each time she arrived with pain rated at a seven out of ten; in May her pain was not reduced, in June her pain was completely reduced to zero, and in July her pain was reduced only to a six out of ten, she reported. (*Id*.).

At the hearing, Carter testified that after rupturing her disc in 2016, she was unable to walk, stand, or sit and was thus unable to work.  (ECF No. 14, PageID.95-96).  She stated that she was unable to stand long enough to do the dishes, had to shower in a chair, and could not walk without a walker prior to her discectomy in November 2016.  (*Id*., PageID.96-97).  Carter testified that post-surgery, she "really didn't get better" but was able to walk for five minutes or so, and continued to suffer from right foot numbness and pain and muscle weakness in the right leg.  (*Id*., PageID.97).  Carter also described having pain in her back and right leg on a daily basis, with some sharp pain, and dull, chronic pain "almost all the time."  (*Id*., PageID.100-101).  She reiterated that she could walk for approximately five minutes, but after that would experience pain and possibly falling down; for that reason she travels with a walker that can also be used as a seat.  (*Id*., PageID.101-102).  In addition, she testified to being limited in bending and twisting (but not reaching), due to fear of the possibility of rupturing her disc again, which limits the housework she is able to do.  (*Id*., PageID.106-107).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

10

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps.... If the analysis reaches the fifth step

without a finding that claimant is not disabled, the burden transfers to the

[Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110

(6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Carter was

not disabled under the Act.  At Step One, the ALJ found that Carter had not

engaged in substantial gainful activity since the alleged onset date.  (ECF No. 14,

PageID.63).  At Step Two, the ALJ found that she had the severe impairments of

obesity; degenerative disc disease of the lumbar spine, status post

microdiscectomy; mild osteoarthritis of the bilateral hands, hips, knees, and feet;

and affective disorder.  (*Id.*).  At Step Three, the ALJ found that Carter's

impairments, whether considered alone or in combination, did not meet or

medically equal a listed impairment.  (*Id.*, PageID.64-66).

The ALJ then assessed Carter's residual functional capacity ("RFC"),

concluding that she was capable of performing light work as defined by 20 C.F.R.

§ 404.1567(b) with the following non-exertional additional limitations:

> [T]he claimant can lift and/or carry up to 10 pounds frequently and up
> to 20 pounds occasionally.  The claimant can stand and/or walk for 4
> hours and sit for 8 hours during an 8-hour workday.  The claimant can
> occasionally climb ramps and stairs.  The claimant can never climb
> ladders, ropes, or scaffolds.  The claimant can occasionally balance (as
> that term is defined in the Dictionary of Occupational Titles (DOT)),
> stoop, kneel, crouch, and crawl.  The claimant can never be exposed to
> dangerous machinery or hazardous heights.  In addition to normal
> breaks, the claimant will be off task 5 percent of the workday.

12

(*Id*., PageID.66).

At Step Four, the ALJ found that Carter was unable to perform any past relevant work.  (*Id*., PageID.71-72).  At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Carter was capable of performing the jobs of garment sorter (55,000 jobs nationally), mail clerk (51,000 jobs nationally), and folder (53,000 jobs nationally).  (*Id*., PageID.72-73).  As a result, the ALJ concluded that Carter was not disabled under the Act.  (*Id.*).

## IV.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.' "  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25

F.3d 284, 286 (6th Cir. 1994).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers*, 582 F.3d at 651 (internal quotations omitted).

V.    Analysis

14

Carter argues that the RFC is not supported by substantial evidence, and that the ALJ improperly weighed the opinion evidence of consultative examiner Thomas Chiambretti, D.O., and examining physician Douglas Geiger, M.D.  The Commissioner responds that the RFC and the weight afforded to the medical opinions are supported by substantial evidence, and that Carter asks the Court to impermissibly reweigh the evidence.[5]

A.

Carter argues that the RFC is not supported by substantial evidence, and that the ALJ's opinion does not meet the requirements of 20 C.F.R. § 404.1545, though she does not explain or identify which requirements of the section were not satisfied.  As the Commissioner notes, Carter then proceeds to summarize the medical evidence of record in a light more favorable to her case than the ALJ's

---

[5] Carter also asserts that "the ALJ did not consider Mrs. Carter's non severe impairments in evaluating her RFC."  (ECF No. 17, PageID.610).  An ALJ who finds that any of a claimant's impairments is severe must "consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not severe."  *Kestel v. Comm'r of Soc. Sec.*, 756 F.App'x. 593, 597 (6th Cir. 2018) (internal quotations omitted).  But as the Commissioner notes, Carter "fails to develop the point past her conclusory claim of error, effectively waiving the issue."  Indeed, Carter does not state which non-severe impairments should have been considered or support this bare assertion with citations to the medical record.  As such, the undersigned declines to consider the argument further. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." (citations omitted)).

summary, but fails to provide an analysis of how the evidence conflicts with the terms of the RFC or proves that Carter is, in fact, disabled.  Instead of highlighting an error in the ALJ's opinion, Carter invites the Court to reweigh the medical record, which is not permissible.  *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014).  "Our task is not to reweigh the evidence.  That is solely the province of the Secretary."  *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) (citing *Wokojance v. Weinberger*, 513 F.2d 210 (6th Cir. 1975)).

Carter does accurately point out that the ALJ mischaracterized the medical record from August 8, 2016.  While the ALJ stated that Carter "felt good until she did a lot of walking yesterday at SVSU," the record actually reflects that she had a pain level of seven out of ten before treatment, was unable to do her stretches at home prior to the session, and had slept on a heating pad due to the pain.  (*cf.* ECF No. 14, PageID.67; PageID.345).  However, the ALJ merely quoted the record from August 10, 2016, and misattributed it to August 8th.  The ALJ's failure to discuss the August 8 record or other specific evidence is not reversible error.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("An ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party.") (internal citations omitted).  Further, as the August 8 record indicates, Carter may have been suffering a high

16

level of pain on that date because she was too sick to take her medications, and her pain post-treatment was reduced to a four out of ten. (ECF No. 14, PageID.345).

Carter also points to her worsening symptoms in late August of 2016, culminating in an MRI and EMG on September 12, 2016 that showed moderate spinal stenosis, a severe impingement at the S1 nerve root, and active right S1 radiculopathy related denervation changes. (ECF No. 17, PageID.610, 612). The ALJ stated that "[t]hroughout the adjudicatory period, other than imaging and studies completed on September 12, 2016, the claimant's imaging and studies generally did not support the claimant's reported disabling symptoms." (ECF No. 14, PageID.67). Carter argues that the ALJ is minimizing this "very important piece of objective medical evidence," but its importance is questionable given that Carter underwent a microdiscectomy on the problem area two months later, as the ALJ acknowledged. (*Id*., PageID.404). Following this procedure, the ALJ found that Carter occasionally exhibited "a delayed gait, tenderness upon palpation, muscle weakness, and positive facet signs bilaterally, sacroiliac signs bilaterally, Gaenslen's test bilaterally, and Patrick's test bilaterally." (*Id*., PageID.68, citing PageID.426, 519, 522, 561). But the ALJ found that generally, Carter's gait was normal and unassisted, with no edema or tenderness, normal muscle tone, no warmth or synovitis in her joints, and only mild degenerative changes of the hands, feet, and knees. (*Id*., PageID.68, citing PageID.432-433, 435, 440, 513, 516, 562-

17

563, 565-566, 569-570, 572-573, 576, 579, 583).  During this time, Carter was

recommended to make dietary changes and to exercise.  She also underwent

treatment in the form of physical therapy and pain relief injections.  (*Id*.).  The ALJ

accurately referred to this as conservative treatment, *see Lorenz v. Berryhill*, No.

18-13793, 2020 WL 1818047, at *6 (E.D. Mich. Jan. 24, 2020) (listing cases)

(prescription medications, injections, physical therapy, and at home exercise are

properly classified as conservative treatment), which fairly discounts a claimant's

allegations of disabling pain, *see Tweedle v. Comm'r of Soc. Sec*., 731 F. App'x

506, 508 (6th Cir. 2018).

Further, the Commissioner has pointed out that much of the evidence

highlighted by Carter is subjective reporting of her symptoms within the record,

which the ALJ rejected as "not entirely consistent with the medical evidence and

other evidence in the record."  (ECF No. 14, PageID.67).  But more importantly,

while Carter may have shown that substantial evidence supports her claim of

disability, she has not shown that the ALJ's conclusion is not also supported by

substantial evidence.  "Substantial evidence exists when a reasonable mind could

accept the evidence as adequate to support the challenged conclusion, even if that

evidence could support a decision the other way." *Casey v. Sec'y of Health &*

*Hum. Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).  There is a "zone of choice"

within which the Commissioner can act without fear of court interference. *Buxton*

18

*v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  If substantial evidence supports the

ALJ's conclusion, even a preponderance of the evidence in favor of the claimant

will not disturb that conclusion.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477

(6th Cir. 2003).  In this case there was more than enough evidence to support the

ALJ's finding.

B.

Carter argues that the ALJ improperly discounted the opinions of

consultative examiner Dr. Chiambretti and examining physician Dr. Geiger.  (ECF

No. 17, PageID.616-618).  She contends that both opinions restricted her to

sedentary work, which would compel a finding that she was disabled upon

reaching age 50 under the applicable regulations.[6]  (*Id.*).  The Commissioner

responds that the ALJ properly found the sedentary restriction to be time-limited,

and that subsequent medical evidence supported this finding.  (ECF No. 18,

PageID.628; ECF No. 14, 69-71).

---

[6] "Individuals approaching advanced age (age 50–54) may be significantly limited in vocational adaptability if they are restricted to sedentary work. When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains." 20 C.F.R. § Pt. 404, Subpt. P, App. 2(g).  This can be offset by a claimant's "recently completed education which provides for direct entry into sedentary work," but "even a high school education or more (ordinarily completed in the remote past) would have little impact for effecting a vocational adjustment unless relevant work experience reflects use of such education." *Id.*

On March 28, 2017, state agency medical consultant Dr. Chiambretti examined Carter's medical records to date in order to assist in an initial disability determination.  (ECF No. 14, PageID.114-128).  The ALJ accurately summarized Dr. Chiambretti's findings as follows:

> [Dr. Chiambretti] opined the claimant would be limited to the sedentary exertional level. He further opined the claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds. He also opined that the claimant should avoid all exposure to hazards such as machinery or heights. Lastly, he opined that it was reasonable to expect ongoing progress in the healing with continued treatment resulting in reduction of the limitations related to her surgery.

(*Id*., PageID.69-70).

"State agency consultants are highly qualified specialists who are also experts in the Social Security disability programs, and their opinions may be entitled to great weight if the evidence supports their opinions." *Todd v. Comm'r of Soc. Sec.*, 2017 WL 3835702, at *3 (W.D. Tenn. Sept. 1, 2017) (citing 20 C.F.R. § 404.1527(e)(2)(i); Soc. Sec. Rul. 96-6p, 1996 WL 374180, 61 FR 34466-01 (July 2, 1996)).  But the consulting physician is, of course, not a treating source.  *See Grisier v. Comm'r of Soc. Sec.*, 721 F. App'x 473, 476 (6th Cir. 2018) (quoting 20 C.F.R § 404.1527(a)(2)).  While an ALJ must specifically explain her reasons for discounting the expert opinion of a treating source, the same detail is not required when an ALJ assigns less weight to the opinion of a non-treating source.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015).  Thus, "the

ALJ was not required to specifically describe which of the consultant's opinions she gave less weight." *Fenderson v. Comm'r of Soc. Sec.*, No. 17-13620, 2019 WL 188968, at *2 (E.D. Mich. Jan. 14, 2019).

Nevertheless, the ALJ explained that she gave "some weight" to Dr. Chiambretti's opinion regarding Carter's ability to "occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds," and that Carter "should avoid all exposure to hazards" due to her morbid obesity and history of L5/S1 microdiscectomy. (ECF No. 14, PageID.70). Despite describing this as "some weight," the ALJ incorporated all of these limitations into the RFC. (*Id.*, PageID.66). The ALJ went on to accord "little weight" to Dr. Chiambretti's opinion that Carter is limited to the sedentary exertional level. (*Id.*, PageID.70). The ALJ reasoned that this finding conflicted with Dr. Chiambretti's own opinion that "[i]t is reasonable to anticipate ongoing progress in the healing with continued treatment resulting in reduction of the limitations related to her surgery." (*Id.*, citing PageID.123). Further, the ALJ found that the medical evidence from later in 2017 and in 2018, which was unavailable to Dr. Chiambretti, substantially supported the finding that Carter would not continue to be restricted to a sedentary level. (*Id.*). As summarized above, that evidence showed a reduction in Carter's limitations and pain levels, as well as recommendations for conservative treatments such as physical therapy and

21

medical injections.  Finally, the ALJ considered the opinion from Carter's neurosurgeon's office (authored by Lindsey Lorello, P.A., and signed by Dr. Geiger), which stated that Carter "should be restricted to lifting and carrying 5-10 pounds for only 3 months, and then could resume 'normal activities within reason.'"  (*Id.*, citing PageID.421).

Carter takes issue with these reasons for discounting Dr. Chiambretti's opinion that she is limited to sedentary work, as opposed to light work with additional limitations as she is assessed in the RFC.  Carter does not address that Dr. Chiambretti's own opinion states that her restrictions would eventually be reduced through the healing process.  And she merely reiterates that the medical evidence postdating his opinion should be read in her favor, an argument which the Court has already rejected.  Carter also finds "logical inconsistency" in the ALJ's reliance on Dr. Geiger's opinion that she could "resume her normal activities within reason" after three months post-operation, while later referring to this part of Dr. Geiger's opinion as "somewhat vague."  (ECF No. 14, PageID.70-71, citing PageID.421).  But as the Commissioner adduces, there is no discord between the two claims.  The opinion signed by Dr. Geiger is clear that Carter's greatest restrictions, to "be very mindful of her bending and twisting and no lifting above 5-10 pounds from waist height," shall remain in place for six additional weeks, and that after three months there will be an even greater reduction of her restrictions.

22

(*Id*., PageID.421).  What is unclear is the exact level of impairment, if any, is

described by the assessment that Carter may "resume her normal activities within

reason, always being mindful of proper back biomechanics."  (*Id*.).  The ALJ noted

that this assessment did not invoke either vocational or functional terms with

which to assess Carter's functional capacity, but nevertheless gave the opinion

"some weight" and adopted more restrictions than one would assume to be

described by "normal activities within reason."  (*Id*., PageID.71).  Further, she

accurately noted that the lifting, bending, and twisting limitations were short term,

and did not fully incorporated them into the RFC.

The ALJ is charged with the responsibility of determining the RFC based on

her evaluation of the medical and non-medical evidence.  She is not required to

base the RFC on a physician's opinion, as to require this "would, in effect, confer

upon the treating source the authority to make the determination or decision about

whether an individual is under a disability, and thus would be an abdication of the

Commissioner's statutory responsibility to determine whether an individual is

disabled."  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)

(quoting SSR 96–5p, 1996 WL 374183 (July 2, 1996)).  Here, there were only two

medical opinions for the ALJ to consider regarding Carter's physical limitations,

neither of which was from a treating source, and both of which shortly followed

Carter's discectomy procedure.  Both opinions noted that she would further

23

recover from her condition post-surgery.  It is not a stretch for the ALJ to find that, based on the following evidence over the next year and a half, she had indeed recovered to the extent that she could perform light work with additional restrictions in place.  This is also supported by Carter's treatment record which, with the exception of the aforementioned discectomy procedure, consisted of conservative treatments in the form of physical therapy, recommended at-home exercise, dietary modification, and injections for pain.  Therefore, the undersigned finds no reversible error in the ALJ's weighing of the opinion evidence, and recommends that the ALJ's decision be upheld.

## VI.    Conclusion

For the reasons set forth above, it is RECOMMENDED that Carter's motion be DENIED, the Commissioner's motion be GRANTED, and that under sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

Dated: March 17, 2021                              s/Kimberly G. Altman
Detroit, Michigan                                    KIMBERLY G. ALTMAN
                                                         United States Magistrate Judge


## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Carter v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 17, 2021.

s/Marie E. Verlinde

MARIE E. VERLINDE
Case Manager